IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **YEVETTE CONTRERAS, individually** ) <br> **and as Successor in Interest to decedent** ) <br> **Peter Contreras, RAYLENE R.** ) <br> **CONTRERAS, AILEEN A.** ) <br> **CONTRERAS, JOLEEN S.** ) <br> **CONTRERAS, ABBIE Y. CONTRERAS,**) <br> **all minors, as individuals** ) <br> **and as Successors in Interest to decedent** ) <br> **Peter Contreras, by their Guardian Ad** ) <br> **Litem Monique Alvares, and MARIA G.** ) <br> **CONTRERAS, Individually,** ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **v.** ) <br> ) <br> **CITY OF LEMOORE, KIMBERLY G.** ) <br> **MORRELL, Chief of Police, in her** ) <br> **individual capacity, Police Officer** ) <br> **JEFFREY McCABE, and DOES 1-10 in** ) <br> **their individual and official capacities,** ) <br> ) <br> **Defendants** ) | **CV F 02-6419 AWI DLB** <br><br> **ORDER ON PLAINTIFFS'** <br> **MOTION FOR NEW TRIAL** |

This is a § 1983 wrongful death/civil rights case that stems from a traffic stop by Officer Jeffrey McCabe that went awry and resulted in the death of the detainee, Peter Contreras. The Plaintiffs are the relatives of Contreras, his daughters, wife, and mother. Plaintiffs contended that Officer McCabe used unreasonable, deadly force against Contreras, and that Defendants City

of Lemoore and Police Chief Morrell ratified the conduct of McCabe, had a policy and procedure of ratification, and had inadequate policies and procedures regarding the monitoring, training, and hiring of police officers.  Plaintiffs also brought a claim for 14th Amendment interference with familial relations against Officer McCabe, and state law wrongful death and battery claims against McCabe and the City.  A three week jury trial in this matter began on November 2, 2004. On November 22, 2005, the jury returned a verdict in favor of Officer McCabe on all counts, thus ending the trial.  All Plaintiffs, except for Maria G. Contreras, have filed a motion for new trial. Plaintiffs argue that a new trial is warranted because: (1) the verdict is against the clear weight of the evidence; (2) the court erred by not giving requested jury instructions; (3) Defense counsel made improper arguments/comments; (4) Defense counsel offered evidence in violation of the motions in limine; and (5) there was juror misconduct.  Plaintiffs also move for judgment as a matter of law that Peter Contreras was subjected to excessive force.  For the reasons that follow, Plaintiffs' motion will be denied.

**FACTUAL BACKGROUND**[1]

On March 1, 2002, during patrol, Officer McCabe observed that a white Dodge Neon failed to yield at a red traffic light.  McCabe turned on his unit's overhead lights and made a traffic stop.  McCabe stated that the driver, Peter Contreras, was making physical movements inside his vehicle before he turned into a Fastrip convenience store and parked in one of the parking stalls.  McCabe followed Contreras into the Fastrip and parked approximately 10 to 20 feet at an off-set angle behind Contreras.

McCabe approached and advised Contreras that he stopped him because Contreras failed to stop at a red traffic light.  McCabe requested Contreras' driver's license, registration and proof of insurance.  McCabe observed that Contreras appeared fidgety, had rapid speech, and quickly

---

[1] The factual background is taken largely from the facts utilized in this Court's order on Defendants's Motion for Summary Judgment.  The facts recited here are consistent with the testimony and evidence from the trial. Factual disputes relevant to disposition of this motion are noted.

grabbed at everything requested.  McCabe directed his flashlight into the vehicle, and when Contreras handed him his driver's license, registration and proof of insurance, he shined his flashlight in Contreras' eyes and noticed his pupils had little to no reaction to the light.  McCabe suspected from his observation and experience that Contreras was under the influence of a controlled substance.

McCabe took Contreras' information back to his police vehicle where he began to issue a citation to Contreras for a traffic light violation.  McCabe further ran a check with dispatch to determine if Contreras had any outstanding warrants, and came back negative.  McCabe was also advised that Contreras had prior Health and Safety Code encounters.

McCabe periodically looked toward Contreras' vehicle, and at one point did not observe Contreras in his vehicle.  McCabe took a few steps to the side to have a better view of the inside of Contreras' vehicle and noticed that Contreras was slumped down all the way in his seat.  From his observations, it appeared as though Contreras may have been hiding something inside the vehicle.  McCabe returned to the vehicle and spoke with Contreras.

During the ensuing conversation, Contreras again displayed rapid speech, fidgetiness and an inability to keep still, and no dilation of the pupils.  From his observations, McCabe believed that Contreras was under the influence of a controlled substance.  McCabe advised Contreras that he suspected that Contreras was under the influence of a controlled substance and that he was going to conduct field sobriety tests.  McCabe requested Contreras to step out of the vehicle.  Contreras argued with McCabe, telling him that this was "bullshit," and that he was just going to the store.  McCabe informed Contreras that it would just take a few minutes and if he was not under the influence of a controlled substance, he would be free to go.  McCabe conducted a Romberg test, but the testing was not completed as Mr. Contreras opened his eyes and again argued that it was "bullshit," and that he was just going to the store.  McCabe then proceed to reach for Mr. Contreras' pulse, but Mr. Contreras immediately pulled his hand away.

From his observations and Contreras' unwillingness to cooperate with the preliminary

3

investigation, McCabe strongly believed that Contreras was under the influence of a controlled substance. McCabe told Contreras that he was being detained for further investigation, and that he should accompany him to the patrol vehicle. McCabe inquired from Contreras whether there was anything in the Neon that McCabe needed to be concerned with. Contreras responded that he did not want McCabe to go into his vehicle.

While walking to the patrol vehicle, Contreras made a flinching or jerking movement that appeared to McCabe as if Contreras was about to strike him. McCabe took hold of Contreras's right arm, and again advised him that he was being detained and if everything worked out, he would then be free to go. While McCabe was opening his car's passenger door, Contreras broke loose from McCabe's hold and ran.

McCabe advised dispatch of the "leg bail," and pursued Contreras, commanding him to stop, telling him that he was under arrest, and to get down on the ground. Contreras ignored McCabe's commands, and at one point suddenly stopped, and turned around to face McCabe. It appeared that Contreras was challenging McCabe to a fight. McCabe drew his asp baton, at which time Contreras then ran south bound through the parking lot of the Fastrip. Contreras proceeded to run into Lemoore Avenue.

While in the center of Lemoore Avenue, McCabe testified that Contreras suddenly turned around, challenged McCabe, and tried to hit McCabe. In defense, McCabe struck Contreras four to eight times with the asp baton. Although McCabe continued instructing Contreras to get down on the ground and that he was under arrest, Contreras refused to stop. Contreras kept swinging at McCabe, forcing McCabe to step back each time.[2] McCabe was again able to strike Contreras with the baton, and kept telling him to get down on the ground and that he was under arrest. Contreras ignored repeated commands. Moments later, Contreras said, "All right, man," and got down on the ground in a push-up type position with half his body in the road and the other half

---

[2] Jose Lepe, an eyewitness, testified that he did not see Contreras swinging at McCabe. See November 5, 2004, Testimony of Jose Lepe at 12:18-20.

1   on the sidewalk.  McCabe thought that Contreras was now surrendering and complying with his

2   commands by getting down on the ground.  As McCabe approached Contreras, Contreras jumped

3   up and ran back toward the Fastrip.  McCabe again pursued Contreras, but fell two or three times

4   on the wet grass.  Contreras was now a good distance ahead of McCabe, and ran to the back side

5   of Fastrip.  McCabe followed but lost sight of him.

6       Believing that Contreras could be circling back to his vehicle, McCabe ran back to the

7   front of the Fastrip, and noticed the suspect getting into his vehicle.  Contreras got into his

8   vehicle even though McCabe had commanded him not to do so.  From this point, witnesses gave

9   conflicting testimony.

10      According to Plaintiffs' witnesses Jose Lepe and Francisco Alvarez, who were parked in

11  a stall at the Fastrip, in essence, Contreras backed the car up slowly so as to avoid the patrol car,

12  smiled at McCabe, and then began to drive away.  McCabe then shot Contreras.  Contreras drove

13  out of the Fastrip parking lot to a nearby field were he soon died.

14      According to Defendant's witnesses Victoria Gutierrez and Joseph Dobbins, who were in

15  separate vehicles at the corner intersection next to the Fastrip, in essence, Contreras backed up

16  his car very quickly toward McCabe.  McCabe was required to quickly move out of the way in

17  order to avoid being struck by the car.  As the car backed up, McCabe fired to defend himself and

18  repel the attack from the car.

19      At trial, the jury believed McCabe's theory of the case and found that Contreras was not

20  subject to excessive force.  This motion followed the jury's verdict.

21

22                          **LEGAL STANDARD**

23      Rule 59(a) provides that: "[A] new trial may be granted to all or any of the parties and on

24  all or part of the issues (1) in an action in which there has been a trial by jury, for any of the

25  reasons for which new trials have heretofore been granted in actions at law in the courts of the

26  United States."  A district court's denial of a motion for a new trial or to amend a judgment

27

28                          5

1   pursuant to Rule 59 is reviewed for an abuse of discretion.  See Far Out Productions, Inc. v.

2   Oskar, 247 F.3d 986, 992 (9th Cir. 2001); Defenders of Wildlife v. Bernal, 204 F.3d 920, 928-29

3   (9th Cir. 2000).  A district court abuses its discretion when it bases its decision on an erroneous

4   view of the law or a clearly erroneous assessment of the facts.  See Coughlin v. Tailhook Ass'n,

5   112 F.3d 1052, 1055 (9th  Cir. 1997).

6        Rule 59 gives the trial judge the power to prevent what he considers to be a miscarriage

7   of justice.  See Moist Cold Refrigerator Co. v. Lou Johnson Co., 249 F.2d 246 (9th Cir. 1957).

8   As such, a trial judge may grant a new trial if "the verdict is contrary to the clear weight of the

9   evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the

10  trial court, a miscarriage of justice."  Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d

11  978, 1005 (9th Cir. 2004); United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th

12  Cir.1999); Roy v. Volkswagen of America, Inc., 896 F.2d 1174, 1176 (9th Cir.1990); Air-Sea

13  Forwarders, Inc. v. Air Asia Co., Ltd., 880 F.2d 176, 190 (9th Cir. 1989).   The burden rests on

14  the party seeking the new trial to show prejudicial error.  See Malhiot v. Southern California

15  Retail Clerks Union, 735 F.2d 1133, 137 (9th Cir.1984); Corder v. Gates, 688 F.Supp. 1418,

16  1424 (C.D. Cal. 1988).

17        In considering a motion for a new trial, the court may weigh the evidence and assess the

18  credibility of witnesses, and the court need not view the evidence in the light most favorable to

19  the prevailing party.  See Air-Sea Forwarders, 880 F.2d 176.  However, it is not enough that the

20  trial judge would have reached a different verdict from the jury.  See 4.0 Acres, 175 F.3d at 1139;

21  Roy, 896 F.2d at 1176.  As explained in *Landes*, after weighing the evidence, the trial judge faces

22  a difficult task:

23          It may be doubted whether there is any verbal formula that will be of much use to
            trial courts in passing on motions [for a new trial on the grounds that the verdict is
24          against the clear weight of the evidence].  Necessarily all such formulations are
            couched in broad and general terms that furnish no unerring litmus for a particular
25          case.  On the one hand, the trial judge does not sit to approve miscarriages of
            justice.  His power to set aside the verdict is supported by clear precedent at
26          common law and, far from being a denigration or a usurpation of jury trial, has
            long been regarded as an integral part of trial by jury as we know it.  On the other

27

28                                         6

hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case. *If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.*

Landes Const. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (internal cites and quotations omitted) (emphasis added). "Doubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury has made a mistake." Landes Const., 833 F.2d at 1372 (citing Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 35 (1944)).


A.    **VERDICT AGAINST THE CLEAR WEIGHT OF THE EVIDENCE**

Plaintiffs argue that the verdict by the jury is against the clear weight of the evidence. Plaintiffs argue that McCabe failed to bring in sufficient evidence to support the use of deadly force. In contrast, Plaintiffs argue that they presented sufficient evidence to show that McCabe was in a position of safety at the time of the shooting and that McCabe was not abating any risk to others by shooting Contreras. Plaintiffs also argue that McCabe's testimony was repeatedly impeach by his prior testimony and by eye witnesses. In particular, Plaintiff relies on the testimony of Jose Lepe. Plaintiffs emphasize that Lepe was an eyewitness who saw the incident while he was between his truck and the store.

Testimony of Jose Lepe

In pertinent part, Plaintiffs emphasize that Lepe testified that during the struggle, Contreras was able to break away from McCabe. In attempting to chase Contreras, McCabe fell several times on the wet grass. Lepe testified that Conteras ran around the building with McCabe following. Lepe stated that Contreras came around the building, got in his car, started it up, and then backed it up. Lepe testified that McCabe had not yet rounded the corner of the building when Contreras's car went in reverse. McCabe then came around the corner of the building and

passed in front of Lepe's truck.  Lepe testified that McCabe was walking on the sidewalk in front

of the store as the car was driving away.  Lepe stated that he heard no screeching tires.  Lepe

testified that Contreras's vehicle was making its turn out from between the police car and the

store when McCabe came alongside the vehicle and told Contreras to stop.  Contreras's window

was up and Lepe testified that Contreras turned towards McCabe and appeared to smile at

McCabe.  Lepe testified that Contreras proceeded forward in the car and McCabe was pacing the

speed of Contreras's vehicle along the driver's side yelling "stop, stop, stop."  Lepe testified that

McCabe drew his gun before following Contreras's vehicle,[3] and that the end of the gun was five

to ten feet away from Contreras's car when McCabe fired.  After firing the gun, Lepe testified

that McCabe walked and then attempted to fire another shot, but the gun misfired.  Lepe stated

that the only time that McCabe was behind Contreras's car was immediately following the first

shot.  Lepe testified that Contreras' vehicle was already going forward and was fifteen feet away

when McCabe attempted to fire a second shot.

<u>Testimony of Jeffrey McCabe</u>

With respect to McCabe's own testimony, Plaintiffs argue that McCabe testified at trial

that he was within the general area of the rear of Contreras' vehicle when it was backing up.

Plaintiffs emphasize that McCabe was unable to identify a specific area where he was standing

when the car began backing up.  Plaintiffs argue that McCabe had previously stated that he was

in a different location when the car began to back up.  McCabe stated that he approached

Contreras in "one fluid motion" and ordered Contreras to not get into his vehicle.  Plaintiffs

argue that McCabe testified that at the time he approached Contreras that Contreras was trying to

escape.  Because the police car was parked behind Contreras's car, McCabe knew that Contreras

had to back up and maneuver to leave.  Furthermore, Plaintiffs point out that McCabe's

deposition testimony was read into the record where McCabe admitted that he stayed to the

---

[3]Plaintiffs do not rely on this particular piece of testimony in their argument, rather it is included for continuity.  <u>See</u> November 3, 2004, Testimony of Jose Lepe at 58: 6-13.

1   driver's side of Contreras's vehicle in order to avoid being hurt.  See November 4, 2004,

2   Testimony of Jeffrey McCabe at 66.  In that same deposition excerpt, McCabe admitted that he

3   had sense enough to stay on the driver's side of Contreras's vehicle with the gun pointed at the

4   driver.  See id.  Plaintiffs argue that McCabe also testified that he did not need to take cover or

5   concealment in order to avoid being hurt in the shooting incident with Contreras.  See id. at 64.

6   Plaintiffs argue that McCabe testified that he had not fired wildly, had gone into a "Weaver

7   stance," and had placed his shot by aiming.[4]  See November 5, 2004, Testimony of Jeffrey

8   McCabe at 8, 9, 136.  In deposition testimony, McCabe admitted that he shot Contreras through

9   the driver's side window.  Plaintiffs also argue that McCabe admitted telling Matt Gonsalves that

10   he tried to shoot Contreras again as Contreras was leaving.

11          Plaintiffs argue that evidence shows that Contreras did not pose an immediate threat to

12   the safety of McCabe.  Plaintiffs argue that, McCabe never saw Contreras with a weapon in his

13   hand.  Plaintiffs argue that McCabe never saw Contreras make a fist.  Plaintiffs argue that, even

14   while trying to escape, Contreras "did not place McCabe in harm's way."  Plaintiffs argue that

15   McCabe testified that he told the Internal Affairs investigators and District Attorney investigator

16   Ponting that he had not heard the tire break traction.  Plaintiffs further point out the McCabe

17   testified that he believed that he was behind Contreras's vehicle, had seen the tail lights on, but

18   that he did not recall seeing the backup lights come on.  See November 4, 2004, Testimony of

19   Jeffrey McCabe at 142-143.  Plaintiffs emphasize that deposition testimony was introduced as

20   impeachment that showed McCabe was in no danger when Contreras was leaving.  See

21   November 5, 2004, Testimony of Jeffrey McCabe at 175-76.  That deposition testimony read:

22          **Q:    You had enough common sense to stay on the driver's side of the car with the**

23

---

24          [4]McCabe, however, also testified with respect to having "placed" his shot or whether the shot was
    "deliberate," that: "It was a word that I used to describe myself firing my weapon.  It wasn't a deliberate – it wasn't

25   deliberate saying I placed it [the shot] right there.  I had no idea where I placed the shot.  It was a descriptive word."
    November 5, 2004, Testimony of Jeffrey McCabe at 9:14-17.

26          Additionally, the referenced portion of McCabe's testimony regarding a "Weaver stance" is in reference to
    McCabe approaching Contreras' car.  Plaintiffs' referenced deposition segment indicates that McCabe advanced

27   towards Contreras in a "Weaver stance" and kept that position as McCabe moved.  See id. at 136:9-137:6.

28                                              9

1   **gun pointed at the driver, right?**

2   A:    At that point, yes.

3   **Q:    And maintained your position on the left side on the driver's side, didn't
       you?**

4

5   A:    That's correct.

6   **Q:    And eventually you shot him from the driver's side and the bullet entering
       the driver's window, didn't you? Factually that's what . . . .**

7   A:    Factually that's what happened.

8   Id.[5]

9

10

_____

11   [5]Defense counsel did question McCabe concerning this impeachment evidence.  The defense gave the
following explanation:

12        Q:    Line 10.
              "Question: You had enough common sense to stay on the driver side of the car with the gun

13              pointed at the driver, right?"
              "Answer: At that point, yes."

14              What point in the sequence in time were you responding to?

15        **A:    At that whole fluid motion of me approaching Mr. Contreras as he's in his vehicle and as
              he's making that first initial backup.**

        Q:    You're to the left of him at that time; correct?

16        **A:    Yes, sir.**
        Q:    Line 14.

17              "Question: And maintained your position on the left side on the driver's side, didn't you?"
              "Answer: That's correct."

18              In relationship to the even, what did that mean?

19        **A:    As he's still backing up on his first initial movement?**
        Q:    Correct.

20        **A:    I was on the left-hand side of the vehicle.**
        Q:    Line 17.

21              "Question: And eventually you shot him from the driver's window, didn't you?"
              "Answer: Factually, that's what happened."

22              What did that mean.

23        **A:    Based on the evidence that I have read that was conducted by the investigators, I believed I
              had fired behind the vehicle.  The evidence shows that the bullet was fired while the vehicle -
              - I'm sorry, while I was on the left-hand side of the vehicle.**

24        . . . . . . .
        Q:    When you answered the question, was your answer based on the knowledge of those facts that you
              had subsequently learned?

25        . . . . . . .
        **A:    Yes, I did.**

26
November 5, 2004, Testimony of Jeffrey McCabe at 192:24-194:23.

27

28                                        10

<u>Physical Evidence Through Discovery Responses</u>

Finally, Plaintiffs argue that the physical evidence does not support the jury's verdict. Plaintiffs argue that McCabe's responses to requests for admission were read to the jury. Those responses establish that: (1) the bullet fired by McCabe entered Contreras' body on the left side and exited on the right; (2) the bullet fired passed though the body of Contreras and struck the front passenger seat; (3) the bullet fired struck the closed driver's door; (4) the bullet fired passed though the closed driver's door window of the car driven by Contreras; and (5) the bullet fired shattered the driver's door window of the car driven by Contreras. <u>See</u> Plaintiffs' Motion for New Trial at 20:7-19. Plaintiffs argue that, based on these admissions, it is clear that at the time the shot was fired by McCabe he was to the side of the vehicle and in no danger of being struck.

Plaintiffs argue that McCabe has not brought forward sufficient evidence for the jury to find that he was acting in response to a significant threat of death or serious bodily injury. Thus, in light of the above evidence, Plaintiffs argue that the verdict is against the clear weight of the evidence.

### *Discussion*

Defendant McCabe argues that Plaintiffs rely on "perceived" inconsistencies by McCabe and ignore or unreasonably dismiss the evidence that supports the jury's verdict. Defendant argues that his own testimony and that of Victoria Gutierrez, Joseph Dobbins, and Joe Callanan provide sufficient evidence to support the jury's verdict. The Court is inclined to agree with Defendant.

<u>Additional Testimony of Jeffrey McCabe</u>

Officer McCabe testified at trial that, when he returned to the Fastrip, Contreras was at the rear of his [Contreras's] vehicle. <u>See</u> November 5, 2004, Testimony of Jeffrey McCabe at 136:1-7. McCabe testified that he pulled out his weapon and advanced towards Contreras. <u>See</u> <u>id.</u> at 136:8-10. Contreras got into his car and McCabe continued to advance. <u>See</u> <u>id.</u> at 137:5-138:19. McCabe testified that he observed Contreras' car move, and in particular, the first

movement was the car backed up to avoid hitting the police car. See id. at 139:16-20. McCabe

testified that the car then went forward and stopped. See id. at 139:21-23. When the car went

forward, McCabe testified that he was standing in the general rear area of Contreras's vehicle and

that he was still yelling commands at Contreras. See id. at 140:8-13. McCabe then testified that,

after Contreras's car went forward, "It immediately - - it was slammed in reverse. I observed the

vehicle coming at me at a high rate of speed. Fearing that the vehicle was going to strike me, I

stepped - - firing and stepping all in on fluid motion. That's what I recall at that time."[6] Id. at

140:15-19. In fact, McCabe also testified, "I thought the vehicle was going to strike me. Based

on all his [Contreras's] activity that he's doing, I figured this guy is coming back to kill me." Id.

at 142:7-10. McCabe testified that the car, after going in reverse, stopped and accelerated out of

the parking lot. See id. at 140:20-22. From the time the car first moved to the time it accelerated

out of the parking lot, McCabe estimated that a "split second" or "seconds" elapsed. See id. at

140:23-141:1. McCabe testified that when Contreras's car backed up the first time (to avoid

hitting the police car) and then went forward, the car had an avenue of escape to leave the area

and McCabe was aware of nothing that would have prevented the car from getting out of the

parking lot. See id. at 141:4-18.

In response to questions by counsel for Plaintiff Maria Contreras, McCabe explained that,

as he was advancing towards Contreras, McCabe was on/at the side of Contreras's car giving

Contreras numerous directives to not get in the car, to stop, to get on the ground, and that

Contreras was under arrest. See id. at 169:14-170:5. McCabe testified that, "It was Mr.

Contreras that positioned his vehicle to where I was standing at." Id. at 170:3-5. Furthermore,

McCabe reiterated that, when Contreras's car backed up and right before McCabe fired his gun,

the car was "coming back pretty quick" and was going "fast enough where he [Contreras] could

kill me." Id. at 171:3-8.

---

[6]Previously, McCabe testified in a similar vein: "Mr. Contreras backed that vehicle up at such a high rate of
speed, I had a split second decision to react. As I'm stepping out, I'm firing my weapon out of the way of being hit
from Mr. Contreras." Id. at 22:14-18.

Testimony of Victoria Gutierrez

Victoria Gutierrez was 19 years old when she and her friend were driving through Lemoore on the way to a Taco Bell. See November 12, 2004, Testimony of Victoria Gutierrez at 5:2-19. Victoria Gutierrez testified that Contreras jumped into his car and that McCabe had his gun out and kept yelling at Contreras to stop. See id. at 8:25-9:5. Gutierrez testified that, at the time Contreras started his car, McCabe was "behind the car to the side" and not far away, but was to one side more than the other. See id. at 9:6-15. Gutierrez testified that after Contreras's car started, it pulled out going "really fast" and that the tires were squealing. See id. at 9:19-24. Gutierrez testified that the car went back and then went forward. See id. at 10:2-3. Gutierrez testified that the car went back at an angle towards the left and in the direction where McCabe was standing. See id. at 10:4-23. Gutierrez then saw McCabe jump back and fire his gun. See id. at 10:24-25. Gutierrez testified that, as Contreras's car was backing up towards McCabe, the instant before McCabe fired his gun, the car was "inches" or "really close" to McCabe. See id. at 12:8-14. Gutierrez testified that from the time Contreras's car first started backing up to the time it exited the parking lot, "five seconds at most" had elapsed and the event "happened very fast." See id. at 12:22-25.

In response to questions on cross-examination, Gutierrez testified that, "The officer jumped to the side when the car backed up because the car almost hit him, and that's when he fired his gun." Id. at 26:23-27:1. When asked whether the car backed up past where McCabe was standing, Gutierrez replied, "No. He [Contreras] almost hit the officer, and he [McCabe] jumped to the side." Id. at 46:20-22. Also, Gutierrez had previously spoken to an investigator in which she stated that she felt bad for McCabe. When asked to explain what she meant, Gutierrez responded:

**A:** **Because I feel like he felt like his life was in danger and he was doing what he could do to protect himself, but I don't - - I don't know.**

Q:  Is that what you saw?

**A:** **That's why I feel bad because I don't think he wanted to kill anybody, and I**

13

**don't think that's what he was trying to do.  I just think that he felt like his life was in danger.**

Id. at 81:5-16..[7]

<u>Testimony of Joseph Dobbins</u>

Joseph Dobbins testified that, after Contreras's car was moving and McCabe was verbalizing something to Contreras, "The car - - the car was going back as fast as it could, and then as it appeared that the officer was in the path of the car and he stepped out of the way and then from  - - I just remember seeing the recoil of the gun."  November 16, 2004, Testimony of Joseph Dobbins at 13:11-15.  Dobbins described the movement of the car as going "backwards and then immediately went forwards again.  So I guess it eventually came to a stop because it had

---

[7]Plaintiffs argue that the testimony of Gutierrez is not worthy of credence because Gutierrez gave a prior statement in which she said that McCabe shot when Contreras was going forward and had also stated that she was on the passenger side and "that she couldn't really see [what was occurring at the time of the shooting] because [she] was more on the passenger side, and the cop was on the car's driver's side. . . ."  Plaintiffs' Reply to Opposition to Motion for New Trial at 6:9-12.  Plaintiffs' also argue that Gutierrez was unreliable because she observed the events from a poor vantage and "had been relentlessly 'worked' with by the defendant's friends and attorneys."  Id. at 6:15-16.

Although Gutierrez stated in a prior statement that the car was going forward when McCabe fired his gun, she had just testified that the incident had happened "really fast."  See November 12, 2004, Testimony of Victoria Gutierrez at 37:20-38:1.  A prior inconsistent statement does not require that the entirety of a witness's testimony be disregarded.  Gutierrez testified that the car was moving backward at McCabe very quickly, that McCabe jumped out of the way and fired, and repeatedly testified that the event happened very fast and "within seconds."

Gutierrez also testified that she had a clear view of the parking lot.  See id. at 41:17-19.  Gutierrez did not state that she "couldn't really see [what was occurring at the time of the shooting] because [she] was more on the passenger side, and the cop was on the car's driver's side. . . ."  Plaintiffs' Reply to Defendant's Opposition to Motion for New Trial.  Plaintiffs are referring to a portion of the transcript were Attorney Seeman asked:

**Q:**     **Were you asked, "Did you see whether or not the vehicle backed up past the officer?"**
A:      I don't believe so.  At least not in those words.
**Q:**     **Well, were the actual words, quote: "Okay, did you see whether or not the vehicle backed up past the officer, in other words?"  To which you answered, I really - - I'm sorry, to which you answered, quote, "I couldn't really see because I was more on the passenger side, and the cop was on the car's driver's side. So."**

November 12, 2004, Testimony of Victoria Gutierrez at 49:22-50:5.

The impeachment question deals with whether the vehicle had backed up past McCabe.  Because of her perspective, Gutierrez was not sure.  Being unsure whether the vehicle backed up past McCabe because of one's relative position is not the same as saying Gutierrez "couldn't really see [what was occurring at the time of the shooting]."  The impeachment testimony does not go as far as Plaintiffs desire.

Finally, the Court sees nothing that suggests that Gutierrez had been "relentlessly 'worked' with by defendant's friends and attorneys."  To the contrary, Ms. Gutierrez was a third party who seemed to have a sincere demeanor.  This hyperbole does not aide Plaintiffs' arguments.  Cf. <u>Abordo v. Hawaii</u>, 938 F.Supp. 656, 662 n.8 (D. Haw. 1996).  Even considering inconsistencies between past and current testimony by Gutierrez, the Court cannot say that her testimony is devoid of value as Plaintiffs' argue.

1   to, but it wasn't for very long at all." See id. at 17:10-13.  Dobbins also testified that, when

2   McCabe fired his gun, "the direction of the car was still going backwards and then it was just a

3   split second later, [the car] was going forwards." Id. at 56:5-9; see also id. at 57:6-59:11.

4   Dobbins testified that McCabe was 12 to 15 feet away when he fired.  See id. at 59:19-20.

5   However, Dobbins also testified that, "The angle - - the police officer was - - like I said was 12 to

6   15 feet, but the car it appeared was closing that distance very, very fast because the car was

7   moving so fast.  So it was closing that distance.  So he - - by the time he [McCabe] moved and

8   shot, he was right at the back door, it looked like, when I saw the recoil." Id. at 59:21-60:3.

9   Dobbins testified that McCabe moved "so as to avoid the car." Id. at 49:8-12.  From portions of

10  a prior statement, Dobbins stated that Contreras had "tried to whip the car around" while backing

11  up.  See id. at 58:11-14.  Dobbins explained that he meant that Contreras "was bringing the rear

12  end towards the police officer.  And he [Contreras] - - and on the arching motion he - - he didn't

13  have to go as far as he did." Id. at 63:15-17.  In answer to how far Contreras's car had backed

14  up, Dobbins testified, "In relationship to where the officer was standing, it went right over where

15  he [McCabe] was standing." Id. at 16:19-22.  Also, Dobbins testified several times that

16  Contreras's car was backing up very fast.  See id. at 13:12; 59:23-25; 61:19-21.  Finally, Dobbins

17  testified that he recalled seeing the back up lights come on Contreras's car.[8]  See id. at 74:4-7.

18  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

19      [8]Plaintiffs argue that Dobbins's testimony is unworthy of credence.  Plaintiffs argue Dobbins is an
    unreliable witness because he had been drinking that night and because of his location.  Plaintiffs argue that Dobbins
20  drew dramatically different drawings between the time of the incident and the time of trial.  Plaintiffs also argue that
    Dobbins could not remember seeing Jose Lepe's truck at the Fastrip.  Plaintiffs finally argue that, "Peter Ferguson
21  and the police officers associated with the City of Lemoore obviously hounded or worked each of these witnesses
    until they were sufficiently confused, or, indoctrinated to provide testimony favorable to McCabe, though obviously
22  inconsistent with that previously provided."  Plaintiffs' Reply to Opposition to Motion for New Trial at 7:7-10.

        It is true that Dobbins had been drinking on the night of the shooting, but Dobbins states that he had two to
23  three beers over a two-hour period and testified that it is not his practice to drink while driving.  See November 16,
    2004, Testimony of Joseph Dobbins at 31:11-25.

24      Plaintiffs do not indicate which of Dobbins' diagrams are inconsistent, presumably Plaintiffs mean that
    Exhibit 123 shows very little of a backward curve towards Officer McCabe, and Plaintiffs' Exhibit 121 shows a more
25  pronounced curve.  However, when asked whether Contreras's car was still backing up when Dobbins saw the gun
    recoil, Dobbins answered, "The car, it was - - it looked like the car was still going backwards.  It looked like the guy
26  was almost like tried to whip the car around kind of, you know? . . . the back end of the car was coming toward the
    police officer."  See November 16, 2004, Testimony of Joseph Dobbins at 58:5-22 (portion of Dobbins's testimony
27  from the prior proceeding that was read to this jury).  A poorly drawn diagram is not grounds to disregard Dobbins'

28                                              15

1              <u>Testimony of Joe Callanan</u>

2          The testimony of Joe Callanan is consistent with McCabe, Gutierrez, and Dobbins,

3   although Callanan was an expert witness and was not present when the shooting occurred.

4   Callanan testified that, after reviewing various materials and transcripts, his opinion was that the

5   use of deadly force by McCabe was objectively reasonable to the perceived threat and was

6   consistent with modern police training.  <u>See</u> November 12, 2004, Testimony of Joe Callanan at

7   10:3-11:6.  Callanan later testified that the use of deadly force was reasonable on two grounds:

8   self-defense and to repel an attack.  <u>See id.</u> at 57:5-8.  Callanan also testified that training is clear

9   with respect to a situation where a car is used to attack as opposed to flee.  <u>See id.</u> at 40:9-12.  In

10  such a situation, an officer is trained to shoot at the person in command of the car that is being

11  used as a weapon.  <u>See id.</u>

12             <u>Physical Evidence Through Discovery Admissions</u>

13         Plaintiffs argue that the physical evidence, as established by responses to requests for

14  admissions, show that: (1) the bullet fired by McCabe entered Contreras' body on the side and

15  exited on the right; (2) the bullet fired passed though the body of Contreras and struck the front

16  passenger seat; (3) the bullet fired struck the closed driver's door; (4) the bullet fired passed

17  though the closed driver's door window of the car driven by Contreras; and (5) the bullet fired

18  shattered the driver's door window of the car driven by Contreras.  Thus, Plaintiffs' argue that

19  this physical evidence establishes that McCabe was in a position of safety when he fired his gun.

20         However, this issue was addressed in part by the testimony of Joe Callanan and Joseph

21  Dobbins.  Joe Callanan explained that the time it takes from the moment that one perceives a

22

23  ─────────────────

24  testimony.  Furthermore, the fact that Dobbins remembers some details, but not others does not make his testimony
    unbelievable.
25          Finally, there is nothing that indicates that either the Lemoore Police Department or Defense Counsel
    "hounded" or "worked" Dobbins to the point of confusion or indoctrination.  Dobbins answered generally with very
26  little hesitation.  He is a member of the United States Navy and did not appear the type of witness who could be
    easily "indoctrinated;" he appeared to be a strong and independent witness who gave quick responses and was sure
27  of his answers.  This hyperbole does not aide Plaintiffs.  <u>Cf. Abordo</u>, 938 F.Supp. at 662 n. 8.  Even considering
    Plaintiffs' concerns over Dobbins' testimony, the testimony is not devoid of value as Plaintiffs argue.

28                                    16

threat to the time that one can intellectually process and respond to the threat is lag time.  See

November 12, Testimony of Joe Callanan at 41:17-42:2.  Callanan explained that the concept of

lag time has been studied by academics, that there is body of scholarly work on the topic, that the

concept is used in military models involving driver reaction time, that he has conducted research

on lag time, that he has published on the topic, and that he has taught on the subject at the police

academy.  See id. at 41:17-43:9.  Callanan concluded that lag time plaid a role in the shooting of

Peter Contreras.  Callanan explained:

> I reasonably conclude that the threat in this case was perceived and responded to, and that the human intellectually told the body to operate the gun and that the gun went off.  That consumed three quarters of a second, perhaps more.  And, therefore, the threat that was first presented is not the same as when the bullet strikes the vehicle or the subject.  Those two things cannot exist at the same second.  One has to follow the other one in sequence.  And there's trajectory information in the readings, gunshot wound information readings that seemingly are inconsistent with the officer's account, but if you put these human factors into the equation, they're consistent.

Id. at 43:19-44:5.  In other words, Callanan opined that lag time explains the physical evidence

relied on by Plaintiffs.

This testimony is consistent with the rendition of events by Joseph Dobbins.  Dobbins

testified that "the car it appeared was closing that distance very, very fast because the car was

moving so fast.  So it was closing that distance.  So he - - by the time he [McCabe] moved and

shot, he was right at the back door, it looked like, when I saw the recoil."  November 16, 2004,

Testimony of Joseph Dobbins at 59:21-60:3.  Dobbins further testified that the car was moving

backwards, McCabe had to move to avoid the car, that McCabe fired while the car was still

moving backwards (or at least near that split second when the car was changing direction), and

the chain of events happened quickly.  See id. at 13:11-15; 49:8-12; 56:5-9; see also November

12, 2004, Testimony of Victoria Gutierrez at 12:22-25; 26:23-27:1; November 5, 2004,

Testimony of Jeffrey McCabe at 22:14-18.  Also, when asked to draw the position of McCabe to

Contreras's vehicle and the path of the bullet, the diagram was consistent with the physical

evidence as established by responses to requests for admissions.  See Exhibit 122.  The tenor of

17

Dobbins' testimony (as well as that of McCabe and Gutierrez) was that the shooting was a quickly evolving situation.

The physical evidence, as established through requests for admissions, is not dispositive because the situation as a whole was fluid. The requests for admissions and the physical evidence that those requests represent tend to show only one snapshot in time. The Plaintiffs' argument with respect to this evidence relies on a static situation or interpretation. However, in determining whether excessive force was used, the Supreme Court has admonished that the determination of reasonableness must "be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must "embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and *rapidly evolving* – about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989) (emphasis added). Although there is contrary testimony, most notably Jose Lepe, the testimony of McCabe, Gutierrez, and Dobbins show a rapidly evolving situation. The physical evidence, as reflected in the responses to requests for admission, are consistent with the jury's verdict when one considers that the car was backing up very quickly, that McCabe had to move to avoid being struck, and McCabe fired as he was getting out of the way. Given that the car itself is moving backwards as McCabe is moving sideways and firing, and given the stress and rapidity of the situation, the physical evidence is not inconsistent with reasonable force. This conclusion is bolstered by the opinions of Joe Callanan. The physical evidence aids Plaintiffs if one views the shooting as a static situation; but given the fluidity of the circumstances, the physical evidence does not undermine a conclusion of reasonable force.

## Conclusion

Plaintiffs' argument that there is insufficient evidence to support a finding that Contreras posed an imminent threat of death is overstated. Plaintiffs focus on portions of McCabe's testimony to the exclusion of other portions; and focus on witness Lepe, to the exclusion of the

other third party witnesses.  The November 5, 2004, testimony of McCabe is generally consistent with the testimony of eyewitnesses Victoria Gutierrez and Joseph Dobbins, who were both in their respective vehicles at an intersection by the Fastrip, and defense expert witness Joe Callanan.   Although the testimony of McCabe, Gutierrez, and Dobbins do not match in every detail, they are consistent on the critical points.  McCabe, Gutierrez, and Dobbins all agree that Contreras's car went backwards towards McCabe at a very high rate of speed, that it was necessary for McCabe to move in order to avoid being struck by the car, and that McCabe fired as Contreras's car was going backward.  This evidence clearly shows an immediate threat of death and/or serious bodily harm to the officer in the form of a fast, backward moving automobile.  Moreover, the demeanor of both Gutierrez and Dobbins appeared to be sincere and credible, and they were third parties with no stake in this case.  It is true that the testimony of Jose Lepe is inconsistent with the testimony of McCabe, Gutierrez, and Dobbins.  However, Jose Lepe is the only person who testified that McCabe walked along the side of the vehicle and then shot Contreras as Contreras was driving forward.[9]  This case was very contentious, emotional, and hotly contested.  Nevertheless, having given full respect to the jury's findings, and having reviewed the evidence and arguments of the parties, and having observed the witnesses during trial, the Court cannot say that it is "left with the definite and firm conviction that a mistake has been committed."  Landes Const., 833 F.2d at 1372.  The jury's verdict is not against the clear weight of the evidence.

---

[9]Plaintiffs do not cite to any portion of the testimony of Francisco Alvarez, an eyewitness who rode to the Fastrip with Jose Lepe.  In front of the Fastrip there are 5 parking spots.  See Plaintiffs' Exhibit 18C.  The fifth parking stall, which is on the far right, is the single designated handicapped stall.  The right side or outer boundary line of the handicapped stall is blue and forms a large blue square with blue diagonals inside.  See id.  This blue, diagonalled square on the right of the handicapped stall itself appears large enough to be a parking stall.  See id.  On the night of the shooting, Lepe's truck was parked in stall number 2 and Contreras's car was parked in stall number 4.  See Plaintiffs' Exhibit 91.  Lepe indicated that McCabe fired his shot while he was standing in the blue, diagonalled square of the handicapped stall.  See November 3, 2004, Testimony of Jose Lepe at 61:6-17.  Alvarez, on the other hand indicated that McCabe shot when McCabe was standing in front of the pickup, in other words, in front of stall number 2.  See Plaintiffs' Exhibit 88a.

**B.      FAILURE TO GIVE REQUESTED JURY INSTRUCTIONS**

Plaintiffs argue that the Court erroneously failed to give six requested jury instructions that related to excessive and deadly force.  Instead of giving the six requested instructions, the Court gave the following instruction based largely on Ninth Circuit Model Instruction No. 11.4:

> The Plaintiffs claim Defendant Officer Jeffrey McCabe, by using excessive force in making a lawful arrest, deprived Peter Contreras of his Fourth Amendment constitutional right to be free from an unreasonable seizure.
>
> A law enforcement officer has the right to use such force as is reasonably necessary under the circumstances to make a lawful arrest.  An unreasonable seizure occurs when a law enforcement officer uses excessive force in making a lawful arrest.  In deciding whether excessive force was used, you should consider the totality of the circumstances at the time.  The reasonableness of a particular use of force must be judged objectively, from the information available at the time from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  As an objective inquiry, reasonableness is determined in light of the facts and circumstances confronting the officer, without regard to his/her underlying intent, motivation, or subjective feelings.
>
> Whether force is reasonably necessary or excessive is measured by the force a reasonable and prudent law enforcement officer would use under the circumstances.
>
> In some circumstances, a law enforcement officer is justified in using deadly force.  Deadly force is that force which is reasonably likely to cause death.  The use of deadly force is subject to the reasonableness requirement of the Fourth Amendment.  A law enforcement officer may reasonably use deadly force if the officer has probable cause to believe that a subject poses an immediate threat of serious physical harm, either to the officer or to others.  Probable cause exists when, under the totality of the circumstances known to the officer, a prudent person would conclude that there is a fair probability that a subject poses a threat of serious physical harm, either to the officer or others.
>
> Some of the things you may want to consider in determining whether an officer used excessive force are the severity of the crime at issue, whether the subject posed a reasonable threat to the safety of the officer or others, and whether the subject was actively resisting detention or attempting to escape.

Court Docket No. 169, Instruction No. 16 "Proposed Excessive/Deadly Force Instruction" (Hereinafter "Instruction 16").

_Legal Standard_

A new trial may be granted on the basis of  "erroneous jury instructions" or "the failure to give adequate [jury] instructions."  See Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th

Cir. 1990).  Courts are to review jury instructions as a whole.  See Underhill v. Royal, 769 F.2d

1426, 1433 (9th Cir. 1985); Los Angeles Memorial Coliseum Comm'n v. National Football

League, 726 F.2d 1381, 1398 (9th Cir. 1984) (hereinafter "Memorial Coliseum"); Van Cleef v.

Aeroflex Corp., 657 F.2d 1094, 1099 (9th Cir. 1981).  The instructions must be formulated so

that they "fairly and adequately cover the issues presented, correctly state the law, and are not

misleading."  Brewer v. City of Napa, 210 F.3d 1093, 1097 (9th Cir. 2000); Fikes v. Cleghorn,

47 F.3d 1011, 1013 (9th Cir. 1995).  The key is that the jury instructions given "must allow the

jury to determine the issues presented intelligently."  Monroe v. City of Phoenix, 248 F.3d 851,

860 (9th Cir. 2001); Fikes, 47 F.3d at 1013; Memorial Coliseum, 726 F.2d at 1398.

However, the instructions given need not be faultless and the trial court "has substantial

latitude in tailoring jury instructions."  See Brewer, 210 F.3d at 1097; Ragsdell v. Southern

Pacific Transp. Co., 688 F.2d 1281, 1283 (9th Cir. 1982); Van Cleef, 657 F.2d at 1099.  The trial

court commits no error by refusing to give inaccurate, incorrect, misleading, or argumentative

instructions.  See Monroe, 248 F.3d at 859 n.3; Fikes, 47 F.3d at 1014; Mitchell v. Keith, 752

F.2d 385, 388-92 (9th Cir. 1985); see also United States v. Jackson, 72 F.3d 1370, 1380 (9th Cir.

1995).  Nor is the trial court under any obligation to give an instruction that lacks a proper

foundation in either law or fact.  See Fikes, 47 F.3d at 1014; Memorial Coliseum, 752 F.2d at

1283.  Furthermore, the trial court is not required to use the precise language requested, or to

incorporate every proposition of law suggested, by a party.  See Kaiser Steel Corp. V. Frank

Colluccio Constr. Co., 785 F.2d 656, 659-60 (9th Cir. 1986); Mitchell, 752 F.2d at 389;

Memorial Coliseum, 752 F.2d at 1283; Van Cleef, 657 F.2d at 1099.  Moreover, the trial court is

not required to give redundant or repetitive instructions where other given instructions cover the

same matter.  See Brewer, 210 F.3d at 1097; Kaiser Steel, 785 F.2d at 659; Mitchell, 752 F.2d at

389; see also Jackson, 72 F.3d at 1380.  "If the instructions given allow a jury to determine

intelligently the questions presented, a judgment will not be disturbed simply because further

amplification was refused."  Ragsdell, 688 F.2d at 1282-83; see also United States v. Norbrook,

21

38 F.3d 440, 446 (9th Cir. 1994); <u>Kaiser Steel</u>, 785 F.2d at 659; <u>Underhill</u>, 769 F.2d at 1433;

<u>Memorial Coliseum</u>, 726 F.2d at 1398.  As long as the jury instructions allow the jury to

intelligently determine the issues presented and allow the parties "room to argue" their theory of

the case to the jury, the failure to give a proposed instruction will not require a new trial.  <u>See</u>

<u>Brewer</u>, 210 F.3d at 1097-98; <u>Fikes</u>, 47 F.3d at 1013-14.

       *1.*     *Plaintiffs' Proposed Jury Instruction No. 74(a)*

       Plaintiffs argue that the Court erroneously refused to give proposed jury instruction No.

74(a).  That instruction read:  "Under the Fourth Amendment the most important single element

in analyzing the reasonableness of force is whether a suspect posed an immediate threat to the

safety of officers or others."  Plaintiffs' Proposed Jury Instruction No. 74(a).

       This proposed instruction is argumentative and adequately covered by the given

instruction.  The jury was instructed that excessive force is determined by the totality of the

circumstances and that the jury may consider the severity of the crime at issue, whether the

subject posed a threat to the safety of the officer, and whether the subject was attempting to

escape.  Furthermore, in *Fikes v. Cleghorn*, the Ninth Circuit held that a general "totality of the

circumstances" instruction that did not mention the three *Graham* factors, including the

immediacy of threat posed by a subject, was an adequate instruction and that additional

amplification was unnecessary.[10]  <u>See</u> <u>Fikes</u>, 47 F.3d at 1013-14.  Instruction 16 tracks the Ninth

Circuit Model instruction and *Graham v. Connor*.[11]  Plaintiffs had "ample room" to focus on and

---

[10]The instruction in *Fikes* read:

    "In making a lawful arrest, an officer has the right to use such force as is necessary under the circumstances to effect the arrest. Whether or not the force used in making an arrest was unreasonable is a question to be determined by you in light of all the surrounding circumstances. Now, you must determine the degree of force that a reasonable and prudent officer on the scene at that time would have applied in effecting the arrest under the circumstances shown from the evidence received in the case." <u>Fikes</u>, 47 F.3d at 1013.

[11]In fact the comments to, and the very content of, Model Instruction 11.4 show that 11.4 is based on *Graham v. Connor.* <u>See</u> Ninth Circuit Model Instructions § 11.4 & Comment (2001); Ninth Circuit Model Instructions § 11.4 & Comment (2005) (found at: http://www.ce9.uscourts.gov/web/sdocuments.nsf/6b42fae391e7c85d88256aae0064a9f1/ba02e1a50e19d9bf88256ab6006874cd?OpenDocument ).

1   argue to the jury  the importance of the immediacy of the threat posed by Contreras.  See Brewer,

2   210 F.3d at 1097-98; Fikes, 47 F.3d at 1013-14.  Plaintiffs' proposed instruction is argumentative

3   and mere amplification of an adequate instruction; the refusal to give Plaintiff's proposed

4   instruction 74(a) does not require a new trial. See Norbrook, 38 F.3d at 446; Kaiser Steel, 785

5   F.2d at 659-60; Underhill, 769 F.2d at 1433; Mitchell, 752 F.2d at 389; Memorial Coliseum, 726

6   F.2d at 1398; Ragsdell, 688 F.2d at 1282-83; Van Cleef, 657 F.2d at 1099.

7       *2.      Plaintiffs' Proposed Jury Instruction No. 75*

8       Plaintiffs argue that the Court erroneously refused to give proposed jury instruction No.

9   75.  That instruction read:  "The proper focus in determining whether the force used was

10  reasonable or not is on events immediately confronting officers when they decide to use that

11  force."  Plaintiffs' Proposed Jury Instruction No. 75.

12      This proposed instruction is adequately covered by Instruction 16.  Instruction 16 twice

13  informs the jury that reasonable force is determined by the circumstances facing the officer "at

14  the time."  The instruction is from the Ninth Circuit Model Instruction 11.4 and adequately

15  conveys the law and the proposition requested by Plaintiffs.  "A court is not required to use the

16  exact words proposed by a party, incorporate every proposition of law suggested by counsel or

17  amplify an instruction if the instructions as given allowed the jury to determine intelligently the

18  issues presented."  Memorial Coliseum, 726 F.2d at 1398.  Plaintiffs' proposed instruction 75 is

19  merely additional amplification of instruction 16 and the refusal to give it does not require a new

20  trial.  See Brewer, 210 F.3d at 1097-98; Fikes, 47 F.3d at 1013-14; Norbrook, 38 F.3d at 446;

21  Kaiser Steel, 785 F.2d at 659-60; Underhill, 769 F.2d at 1433; Mitchell, 752 F.2d at 389;

22  Memorial Coliseum, 726 F.2d at 1398; Ragsdell, 688 F.2d at 1282-83; Van Cleef, 657 F.2d at

23  1099.

24      *3.      Plaintiffs' Proposed Jury Instruction No. 76*

25      Plaintiffs argue that the Court erroneously refused to give proposed jury instruction No.

26  76.  That instruction read:

27

28                                          23

1

2

3

4

5

               Deadly force may not be used unless it is necessary to prevent the escape of a suspected felon and the officer has probable cause to believe that the suspect poses a significant threat of death or physical injury to the officers or others.  The "substantial threat" requirement is not satisfied by danger that is present only as a result of police pursuit.

               The jury must decide whether a reasonable, non-deadly alternative exits for apprehending a suspect: if it does, then the use of deadly force is unreasonable.

Plaintiffs' Proposed Jury Instruction No. 76.  Plaintiffs cite as authority for this instruction

*Brower v. County of Inyo*, 884 F.2d 1316 (9th Cir. 1989) and *Tennessee v. Garner*, 471 U.S. 1, 3

(1985).

6

7

8

9

10

11

12

       The proposed instruction is misleading and likely a misstatement of law.  The first

portion of the proposed instruction concerning deadly force is based on *Tennessee v. Garner*, 471

U.S. 1 (1985).  That case involved a suspect who was killed while trying to escape.  See Garner,

471 U.S. at 3.  Accordingly, the Supreme Court's language that is relied on by Plaintiffs

concerning deadly force is couched in terms of escape.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

       However, it is clear that deadly force may be used even if a subject is not in flight or

escaping.  "A police officer may reasonably use deadly force were he 'has probable cause to

believe that the suspect poses a threat of serious physical harm, either to the officer or to others."

Billington v. Smith, 292 F.3d 1177, 1184 (9th Cir. 2002); Monroe, 248 F.3d at 861; Scott v.

Henrich, 39 F.3d 912, 914 (9th Cir. 1994); see also Harris v. Roderick, 126 F.3d 1189, 1201 (9th

Cir. 1997) ("Officers may not shoot to kill unless, at a minimum, the suspect presents an

immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat

of injury to persons."); Reynolds v. City of San Diego, 84 F.3d 1162, 1168 (9th Cir. 1996).  In

*Billington* for example, Officer Billington used deadly force when he was attacked by Smith.

See Billington, 292 F.3d at 1185.  During Billington's encounter with Smith, Smith charged

Billington and grabbed at Billington's gun.  See id.  At the time of the shooting, Smith was not

fleeing but the use of deadly force was nevertheless appropriate.  See id. at 1180-81, 85.

Similarly, in *Reynolds*, the officer was justified in shooting the suspect when the suspect swung a

knife at the officer, even though the suspect was not fleeing at the time.  See Reynolds, 84 F.3d at

28

1   1164-65, 1168. Thus, it is clear that the reasonable use of deadly force does not have to be

2   predicated on preventing the escape of a suspected felon – it is enough that the officer has

3   probable cause to believe that the suspect poses a threat of serious physical harm either to the

4   officer or to others. See Billington, 292 F.3d at 1184. In other words, an officer may shoot in

5   self-defense or in the defense of others. Plaintiffs' instruction 76 is misleading and inaccurate

6   because it creates the impression that deadly force can only be used to prevent the escape of a

7   suspected felon.

8       Furthermore, the cited authority for the proposition that danger which exists only as a

9   result of police pursuit does not satisfy the "substantial threat" requirement of *Garner,* does not

10  actually support the proposition. In *Brower*, the court noted in a footnote, "It is not clear from

11  Garner that the 'substantial threat' requirement is satisfied by danger that is present only as a

12  result of police pursuit." Brower, 884 F.2d at 1318 n.1. In fact, the *Brower* court went on to

13  expressly state in the same footnote, "We need not address this question and *express no opinion*

14  *on it.* It is one which the district court may have to face and of which it should be aware." Id.

15  (emphasis added). Thus, Plaintiffs' cited authority does not support the proposition of law.

16  Moreover, the facts do not seem to suggest that the danger facing McCabe was present "only as a

17  result" of his pursuit of Contreras. The Court need not give an instruction that lacks an adequate

18  factual base. See Fikes, 47 F.3d at 1014; Memorial Coliseum, 752 F.2d at 1283.

19      The Court need not give proposed instructions that are inaccurate or misleading. See

20  Monroe, 248 F.3d at 859 n.3; Fikes, 47 F.3d at 1014; Mitchell, 752 F.2d at 388. Furthermore,

21  there was no objection to Instruction 16 by any party.[12] Instruction 16 adequately covers the

22

23

24      [12]The Court informed the parties that it would consider each of the parties' specific instructions that the
    Court declined to give as being objected to. That is, the Court deemed that the parties objected to the Court's refusal
25  to give a specific instruction. However, Instruction 16 was not proposed by the parties, rather it was proposed by the
    Court. The Court and the parties discussed Instruction 16 during an informal instruction conference on the evening
26  of November 16, 2004. On November 17, 2004, the Court presented Instruction 16 to the parties and asked for
    further additions, corrections, or comments. No party made any objections or requested any further additions to
27  Instruction 16.

28                                                    25

issue of deadly force under the facts this case.[13]  Because proposed instruction 76 is misleading and inaccurate, there was no error in refusing to give it and a new trial is not warranted.[14]

### 4.   Plaintiffs' Proposed Jury Instruction No. 86

Plaintiffs argue that the Court erroneously refused to give proposed jury instruction No. 86.  That instruction read:  "The reasonableness of the officers' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."  Plaintiffs' Proposed Jury Instruction No. 86.  Plaintiffs cite as authority for this instruction two Tenth Circuit cases, one Seventh Circuit case, and one Eleventh Circuit case.

The proposed instruction is misleading, unnecessarily amplifies one of the three *Graham* factors, and, in part, lacks a foundation in fact.  The jury was instructed that excessive force is determined by the totality of the circumstances and that the jury may consider the severity of the crime at issue, whether the subject posed a threat to the safety of the officer, and whether the subject was attempting to escape.  Instruction 16 tracks the Ninth Circuit Model instruction and *Graham v. Connor*.  Plaintiffs had "ample room" to focus on and argue the threat or lack thereof posed by Contreras to McCabe.  See Brewer, 210 F.3d at 1097-98; Fikes, 47 F.3d at 1013-14.  The instruction is also misleading as it focuses the jury's attention away from the totality of circumstances and focuses it on a single *Graham* factor, even though the *Graham* factors are non-exclusive.  See Fikes, 47 F.3d at 1013-14.

---

[13]Instruction 16 adequately covers deadly force under the facts of this case because either the vehicle driven by Contreras backed up very fast and at McCabe or it did not.  Instruction 16 read in part, "A law enforcement officer may reasonably use deadly force if the officer has probable cause to believe that a subject poses an immediate threat of serious physical harm, either to the officer or to others."  The instruction is based on *Billington*, *Monroe*, *Harris*, *Reynolds*, and *Scott*.  See Billington, 292 F.3d at 1184; Monroe, 248 F.3d at 861; Harris, 126 F.3d at 1201; Reynolds, 84 F.3d at 1168; Scott, 39 F.3d at 914-15.  Under the facts of this case, whether McCabe had probable cause to believe that Contreras posed an immediate threat while maneuvering the car is dispositive.  If McCabe did not have probable cause, then the use of deadly force was unreasonable.  If McCabe did have probable cause, then the use of deadly force was reasonable irrespective of whether Contreras was a fleeing felony suspect.

[14]Additionally, it is not clear that the second paragraph of the proposed instruction is a correct statement of the law in the Ninth Circuit.  See Brewer, 210 F.3d at 1095 & 1097 n.4.

Additionally, although no Ninth Circuit authority is cited, the instruction is a variation of an *Alexander* instruction.[15]  An *Alexander* instruction is one that instructs the jury that police officers may violate the Fourth Amendment by provoking the use of deadly force.  See Billington, 292 F.3d at 1189; Duran v. City of Maywood, 221 F.3d 1127, 1130 (9th Cir. 2000).  An *Alexander* instruction is warranted where "an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation," and even if the use of deadly force is defensive.  Billington, 292 F.3d at 1189.  However, "an *Alexander* instruction is unnecessary where there is no 'evidence to show that the officer's actions were excessive and unreasonable' and caused the 'escalation that led to the shooting,' and where the evidence does not show that the officer's actions 'should have provoked an armed response.'"  Id. (quoting Duran, 221 F.3d at 1131).  Negligent conduct that merely gets an officer into a dangerous situation is insufficient to warrant an *Alexander* instruction, rather, the provoking conduct must be unreasonable under the Fourth Amendment.  See Billington, 292 F.3d at 1190.  As applied to this case, the Court is aware of no evidence of conduct by Officer McCabe prior to the shooting that would be considered a Fourth Amendment violation and is aware of no evidence of conduct by McCabe that would reasonably provoke Contreras's responses throughout the encounter.  See Billington, 292 F.3d at 1189-90; Duran, 221 F.3d at 1130-31.  Accordingly, there is no factual basis for an *Alexander* type instruction.

Plaintiffs' proposed instruction No. 86 is misleading, an unnecessary amplification, and lacks a factual basis.  See Monroe, 248 F.3d at 859 n.3; Fikes, 47 F.3d at 1014; Norbrook, 38 F.3d at 446; Kaiser Steel, 785 F.2d at 659-60; Underhill, 769 F.2d at 1433; Mitchell, 752 F.2d at 389; Memorial Coliseum, 726 F.2d at 1398; Ragsdell, 688 F.2d at 1282-83; Van Cleef, 657 F.2d at 1099.  There is no error or basis for a new trial for refusing to give this proposed instruction.

        *5.      Plaintiffs' Proposed Jury Instruction No. 87*

Plaintiffs argue that the Court erroneously refused to give proposed jury instruction No.

---

[15]*Alexander* refers to Alexander v. City and County of San Francisco, 29 F.3d 1355 (9th Cir. 1994).

87.  That instruction read:  "That police are frustrated is not a relevant factor to be considered when determining the reasonableness of force."  Plaintiffs' Proposed Jury Instruction No. 87.

Instruction 16 stated, "As an objective inquiry, reasonableness is determined in light of the facts and circumstances confronting the officer, without regard to his/her underlying intent, motivation, or *subjective feelings*."  "Frustration" is a subjective feeling.  "A court is not required to use the exact words proposed by a party, incorporate every proposition of law suggested by counsel or amplify an instruction if the instructions as given allowed the jury to determine intelligently the issues presented."  Memorial Coliseum, 726 F.2d at 1398.  Plaintiffs' proposed instruction 86 is argumentative and is merely additional amplification of instruction 16; the refusal to give it does not require a new trial.  See Brewer, 210 F.3d at 1097-98; Fikes, 47 F.3d at 1013-14; Norbrook, 38 F.3d at 446; Kaiser Steel, 785 F.2d at 659-60; Underhill, 769 F.2d at 1433; Mitchell, 752 F.2d at 389; Memorial Coliseum, 726 F.2d at 1398; Ragsdell, 688 F.2d at 1282-83; Van Cleef, 657 F.2d at 1099.

### 6.    *Plaintiffs' Proposed Jury Instruction No. 88*

Plaintiffs argue that the Court erroneously refused to give proposed jury instruction No. 88.  That instruction read:  "Commission of a misdemeanor weighs against finding that the force used was reasonable when the person against whom it was used was non-violent and posed no threat to the safety of officers or others."  Plaintiffs' Proposed Jury Instruction No. 88.

This proposed instruction is adequately covered by Instruction 16.  The jury was instructed that excessive force is determined by the totality of the circumstances and that the jury may consider the severity of the crime at issue, whether the subject posed a threat to the safety of the officer, and whether the subject was attempting to escape.  Instruction 16 tracks the Ninth Circuit Model instruction and *Graham v. Connor*.  Plaintiffs had "ample room" to focus on and argue the weight of a misdemeanor offense committed by a non-violent, non-threatening suspect.  See Brewer, 210 F.3d at 1097-98; Fikes, 47 F.3d at 1013-14.  Plaintiffs' proposed instruction is argumentative and an unnecessary amplification of an adequate instruction; the refusal to give

28

1 Plaintiff's proposed instruction 88 does not require a new trial. See Norbrook, 38 F.3d at 446;

2 Kaiser Steel, 785 F.2d at 659-60; Underhill, 769 F.2d at 1433; Mitchell, 752 F.2d at 389;

3 Memorial Coliseum, 726 F.2d at 1398; Ragsdell, 688 F.2d at 1282-83; Van Cleef, 657 F.2d at

4 1099.

5        *7.     Erroneous Jury Instruction – Instruction 16*

6        Plaintiffs argue that Instruction 16 contains errors of law because it instructed the jury to

7 weigh the "totality of the circumstances." Plaintiffs argue that the instruction was "too

8 amorphous" and failed to specify the weight to be given the various circumstances. Citing to a

9 non-binding, unpublished case from the federal district court of Oregon, Plaintiffs argue that the

10 instruction is contrary to existing law. Plaintiffs further argue that the jury was not properly

11 instructed on the balancing test enunciated in *Graham v. Connor*. Plaintiffs arguments are

12 unpersuasive.

13        First, Plaintiffs made no objection to Instruction 16. Because an objection is required in

14 order to preserve error with respect to a given instruction, Plaintiffs have forfeited any objection

15 to Instruction 16.[16]  See Fed. R. Civ. Pro. 51; Larez v. City of Los Angeles, 946 F.2d 630, 638

16 (9th Cir. 1991).

17        Notwithstanding Plaintiffs' failure to object, Instruction 16 incorporates the entire Ninth

18 Circuit Model Instruction 11.4 on Excessive Force, which is itself based on *Graham v. Connor*.

19 See Ninth Circuit Model Instruction 11.4; footnote 11 *supra*. The instruction is also consistent

20 with Ninth Circuit case law that has upheld as adequate "fairly general reasonableness/'totality of

21 the circumstances' instructions despite the plaintiff's request for more detailed instructions

22 addressing the specific factors to be considered in the reasonableness calculus." Brewer, 210

23 F.3d at 1093; Fikes, 47 F.3d at 1013-14. Instruction 16 adequately covers the issues of excessive

24 and deadly force and allowed the jury to decide the issue intelligently. See Monroe, 248 F.3d at

25 860; Brewer, 210 F.3d at 1093; Fikes, 47 F.3d at 1013; Memorial Coliseum, 726 F.2d at 1398;

26

27     [16]See Footnote 12, *supra.*

28                       29

Ragsdell, 688 F.2d 1283; Van Cleef, 657 F.2d at 1099.  There was no error in giving this instruction.

## C.   ATTORNEY MISCONDUCT – IMPROPER ARGUMENT AND VIOLATIONS OF MOTIONS IN LIMINE

Plaintiffs argue that a new trial is required based on various acts of misconduct by Defense Counsel, Peter Ferguson.  Specifically, Plaintiffs argue that Defense Counsel improperly argued that: (1) McCabe was informed that Peter Contreras had a history of prior Health & Safety Code investigations even though there was no evidence on the dispatcher's printout concerning such a history; (2) Defense Counsel argued and elicited testimony from defense expert Joe Callanan that McCabe could use deadly force to stop a traffic violator, even though that is not the law; (3) Defense Counsel made an improper argument concerning taxpayers in Fresno and argued to the jury that "We pay them [police] to do this for us;" (4) defense witness Victoria Gutierrez made reference to the criminal proceedings against McCabe, which was the subject of a motion in limine by Plaintiffs; and (5) Defense Counsel pre-planned with McCabe for McCabe to testify that he knew that Peter Contreras was under the influence of a controlled substance, despite this Court's ruling on Plaintiffs' motion in limine on the drug use issue.

*Legal Standard*

"A new trial is warranted on the ground of attorney misconduct during the trial where the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict."  Doe ex. rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1270-1271 (9th Cir. 2000); Anheuser-Busch, Inc. v. Natural Beverage Distributors,  69 F.3d 337, 346 (9th Cir. 1995).  Improper and inflammatory jury argument and violations of motions in limine by counsel may both constitute attorney misconduct.  See Bird v. Glacier Elec. Coop., Inc., 255 F.3d 1136, 1152 (9th Cir. 2001); Anheuser-Busch, 69 F.3d at 345-47.  A party should object to alleged instances of attorney misconduct before the jury deliberates to allow the district court "to examine the alleged prejudice and to admonish . . . counsel or issue

a curative instruction, if warranted."   Kaiser Steel Corp. v. Frank Coluccio Constr. Co., 785 F.2d

656, 658 (9th Cir.1986).   "There is a strong presumption that the curative instructions given by

the district court [are] followed by the jury."   Doe, 232 F.3d at 1270.   Accordingly, prejudice

resulting from attorney misconduct may generally be remedied by a curative instruction to the

jury to disregard the misconduct.   See id., at 1270-71; see also B.K.B. v. Maui Police Dep't, 276

F.3d 1091, 1105 (9th Cir. 2002); Barzelis v. Kulikowski, 418 F.2d 869, 871 (9th Cir. 1969).

However, if the misconduct permeates the proceeding, constant objections are not required

because they could antagonize the jury.   Anheuser-Busch, 69 F.3d at 346.

### 1.   No Evidence of H&S History

Plaintiffs argue that there was no evidence that could support the argument that Peter

Contreras had an H&S history.   In particular, Plaintiffs argue that the records submitted from

dispatch do not show any indication of H&S history.   Although McCabe claimed that he had this

information, the records do not support this assertion.

### Discussion

Plaintiffs' argument is without merit.   Officer McCabe testified that, while conducting the

traffic stop, he was informed by dispatch that Contreras had an H&S history ("former contact

with H and S activity").   See November 5, 2004, Testimony of Officer McCabe at 94:12-21.   In

opposition, Defendants agree that the dispatch print-outs do not indicate an H&S history.

However, the testimony of the dispatcher, Melina Padgett, explained that the dispatch print-out

showed that Officer McCabe had requested that an "L1" on Contreras be run.   See Testimony of

Melina Padgett at 75:16-22.   Padgett explained that an L1 is a license check, and, while doing a

license check, dispatch will also do an "NCIC and local check" on a subject.   See id.   An NCIC

checks is used to check for crimes on a national level.   See id. at 76:7-12.   Because an L1 was

done on Contreras, the local and NCIC checks were also done.   See id. at 76:13-14.   Padgett

testified that   the NCIC and local checks are not listed on the print-out.   See id. at 76:14-15.

When asked why that was not reflected, Padgett responded, "It's just showing that [McCabe] did

run the L1 number at 1:34.  We don't document any of that in the call." Id. at 76:17-18.  Results

of the NCIC and local checks come up on a computer screen and no hard copies come out on a

printer.  See id. at 77:3-6.  Padgett testified that information from searches on Contreras would

have been transmitted to McCabe.  See id. at 77:7-10.  From Padgett's testimony, it appears that

the only documentation on the dispatch print-outs concerning criminal history is an indication

that an L1 was requested or performed.  The results of such a search appear to normally be

transmitted verbally to the officer from the dispatcher, but not noted on the dispatch print-out.

Thus, it is not surprising that the dispatch print-out does not mention H&S history.  Furthermore,

McCabe testified to H&S history/activity as something that he was considering in terms of his

interaction and assessment of Contreras.  See November 5, 2004, Testimony of McCabe at 94:5-

95:8.  There is no requirement that, in order to make an argument relating to the existence of an

H&S history, one must have documentary evidence as a foundation.  McCabe's testimony itself

is a basis for mentioning H&S history.  Given McCabe's testimony, and given Padgett's

testimony, there was a basis for counsel to argue the existence of H&S history as something

known to McCabe.

Moreover, before and after McCabe testified about the H&S history, the Court

admonished the jury that the information was introduced for a limited purposes.  See November

5, 2004, Testimony of Jeffrey McCabe at 92:14-21; 94:5-11.  That is, the information was

received to show the state of mind of McCabe and what information McCabe had available to

him when evaluating Contreras, the evidence was not introduced to prove that Contreras actually

had H&S encounters.[17]  See id.; 103:24-104:5.

The reference to Contreras's "H&S encounters" or "H&S history" was not improper and

is not a valid basis for a new trial.

---

[17]Also, the Court notes that Plaintiffs did not object that there was no support in the dispatch records
regarding an H&S history.  Rather, Plaintiffs objected, after the testimony, "I understood that the radio calls, that
came back from health and safety issues were not going to be discussed in detail, according to the motion in limine."
See Partial Transcript of Proceedings of November 5, 2004, at 103:11-14.

1        2.        *Argument & Testimony That McCabe Could Use Deadly Force to Stop A Traffic*
                 *Violator*

2

3         Plaintiffs argue that Defense Counsel and defense expert Joe Callanan argued that

4  McCabe could use deadly force to stop a traffic violator.  That is clearly contrary to the law as

5  established in *Tennessee v. Garner*.  Moreover, there is no case law that says a police officer may

6  use deadly force to apprehend a person suspected of a misdemeanor, let alone a traffic violation.

7  Because the jury found that the use of force was not excessive, the introduction of this argument

8  and the supporting evidence make it "reasonably probable" that the jury made an erroneous

9  conclusion.  In their reply brief, Plaintiffs specifically argue that Defense Counsel made the

10 erroneous suggestion by arguing that, "people around on the street, . . . and that individual getting

11 in that car . . . If he didn't do what he did, [Contreras] could have killed four people a block up

12 the street.  Could you imagine?"  Plaintiffs argue that this shows, coupled with McCabe's

13 testimony of Contreras's dilated eyes, that the only governmental purpose in killing Contreras

14 was that Contreras was driving under the influence.

15        *Discussion*

16         First, Plaintiffs have offered no citations to the testimony of Joe Callanan where Callanan

17 testifies that an officer may use deadly force to stop a traffic violator.  Nor has the Court found

18 anything in Callanan's testimony that supports Plaintiffs' argument.  After an independent review

19 of Callanan's testimony, Callanan testified that he thought deadly force was appropriate in this

20 case for two reasons: self-defense and to repel an apparent attack.  See Testimony of Joe

21 Callanan at 57:6-10.  At one point, Defense Counsel changed the series of hypothetical questions

22 so that the fleeing individual got into his car, slowly backed up, slowly started going forward, and

23 then the officer walked along side of the car and then shot the suspect.  See id. at 48:9-18.

24 Callanan clearly stated that under this hypothetical, deadly force was not justified.  See id. at

25 48:19-22.  The testimony of Joe Callanan fails to support Plaintiffs' argument.

26         With respect to the argument of Defense Counsel, no timely objection appears in the

27 record.  The relevant portion of the transcript reads:

28                                                    33

[Mr. Ferguson:] Joe Callanan said there's a danger to that [the car as a potential weapon and people around on the streets.] And it's great police work to go stop that car and that individual getting in that car because that's what we pay them to do and sometimes we don't like to think about it, but that's what they have to do.  If he didn't do what he did, he could have killed four people a block up the street.  Could you imagine.

He comes around the corner and he's taking his gun out.  And then these individuals manipulate, things taken out of context.

Mr. McMillan: Improper argument, Your Honor.

The Court: Overruled.  Again, statements of counsel are not evidence.  Go ahead.

Closing Arguments of November 17, 2004 at 49:22-50:8.

Although there is an objection, it is to the statement, "And then these individuals manipulate, things taken out of context."  The objection is non-specific, and if it was intended to address a concern that Defense Counsel was arguing that deadly force can be used to stop a traffic violator, then the objection should have so stated.  Cf. Fed. R. Evid. 103(a)(1) (mandating that objections to evidence should be made timely and with specificity); Larez, 946 F.2d at 638 (noting that, with respect to jury instructions, the matter objected to and grounds for the objection should be distinctly stated).

Nevertheless, assuming that the argument is improper, the Court shortly after the statement was made admonished the jury that statements of counsel are not evidence.  Furthermore, the jury was instructed immediately before the start of closing argument that it was not to consider the arguments of counsel as evidence in deciding the facts of the case.  See Court Docket Item No. 169 (jury instructions given in this case which included Ninth Circuit Model Instruction No. 3.3).  In addition to being instructed by the Court that the arguments of the attorneys are not evidence, Defense Counsel himself even emphasized the instruction that the arguments of counsel are not evidence.  See November 17, 2004, Closing Argument of Peter Ferguson at 59:12-13.  There is a strong presumption that juries will follow instructions and adhere to admonishments; Plaintiffs have done nothing to defeat this presumption.  See Doe, 232 F.3d at 1270.

Furthermore, the complained of argument does not reach as far as Plaintiffs would like it. The argument does not say that an officer can legally use deadly force against another who only has committed a traffic violation.  This part of the closing argument is made in the context of argument and testimony that shows that the traffic violation had ceased and that the situation had escalated well beyond merely running a red light.  Although the Court does not necessarily condone this argument, the reasonable inference from the complained of excerpt relates to using deadly force for the protection of others, it does not relate to using deadly force to stop a mere traffic violator.

However, assuming that the complained of closing argument excerpt was improper, the Court cannot say that it so permeated the proceeding that the jury was influenced by passion and prejudice, nor, in the absence of a timely objection can the Court say that the argument caused the integrity or fundamental fairness of the proceedings to be called into question.  See Bird, 255 F.3d at 1148; Doe ex. rel. Rudy-Glanzer, 232 F.3d at 1270-1271; Anheuser-Busch, 69 F.3d at 346.  Moreover, Plaintiffs have not adequately explained how the complained of closing argument excerpt was so prejudicial as to require a new trial.  This ground does not form a valid basis for a new trial.

### 3.     Improper Tax-Payer Argument: "We pay them to do this for us."

Plaintiffs argue that Defense Counsel made an improper jury argument that McCabe was acting for the protection of the public, and that as taxpayers, "we pay police officers to do this for us."  Plaintiffs argue that Defense Counsel stated this three times, and, citing to non-binding, out-of-circuit authority, argues that this type of ad populem argument has been held to be improper in the past.  See, e.g., Antwine v. Delo, 54 F.3d 1357, 1363-64 (8th Cir. 1995) (death sentence vacated where prosecutor argued, "Why should you and I, as lawful, working citizens of this community, working the rest of our natural lives just so Calvert Antwine can live in the penitentiary for the rest of his natural life or at least until he's served 50 years in prison?"); Allstate Ins. Co. v. James, 845 F.2d 315, 318-19 (11th Cir. 1988) (holding, in an insurance case,

1   that a rebuttal closing argument that implied a verdict in plaintiffs' favor would cause insurance

2   premiums to rise and that the jury had the power to prevent the increase in jury costs). Plaintiffs

3   argue that the argument by Defense Counsel was improper and prejudiced the Plaintiffs because

4   it gave the jury an alternate basis on which to rule in favor of the Defendant.

5        *Discussion*

6        First, Plaintiffs at no time made any objection to Defense Counsel's comments about "we

7   pay them to do this for us." Second, even if Plaintiffs had timely objected, the statements are

8   rather innocuous. They are unlike the arguments in either *Antwine* or *Allstate* in that they do not

9   directly seek to influence the jury by insinuating that a plaintiff's verdict will produce more out

10   of pocket expenses, e.g. they will pay to keep a murderer alive or that their premiums will go up.

11   See Allstate, 845 F.2d at 319. Furthermore, Defense Counsel's comments were not made in

12   rebuttal, which would have left Plaintiffs with no opportunity to respond. See id. Nor are the

13   comments anything like the arguments in *Bird*, which played on racial biases and stereotypes, so

14   as to warrant a finding of fundamental error. See Bird, 255 F.3d at 1152. Also, in context, the

15   comments reflect that McCabe was paid to be an officer because it is a difficult job that requires

16   being placed in difficult and uncomfortable situations. The comments also answer to some

17   degree, as Defendants suggest, Plaintiffs' argument that McCabe could have simply retreated

18   because McCabe is paid to pursue and make arrests.

19        Although the comments may play to the sympathy of the jury, they do not reach such a

20   level that is prejudicial. Even assuming that the argument was improper, the Court cannot say

21   that it so permeated the proceeding that the jury was improperly influenced by passion and

22   prejudice nor, in the absence of a timely objection, can the Court say that the arguments caused

23   the integrity or fundamental fairness of the proceedings to be called into question. See Bird, 255

24   F.3d at 1148; Doe ex. rel. Rudy-Glanzer, 232 F.3d at 1270-1271; Anheuser-Busch, 69 F.3d at

25   346. Moreover, Plaintiffs have failed to adequately explain how the complained of closing

26   argument excerpt was so prejudicial as to require a new trial. This ground is not a valid basis for

27   a new trial.

28

1        *4.       Violation of Motion In Limine For Witness Mentioning Criminal Proceedings*

2        Plaintiffs argue that this Court granted Plaintiffs' Motion in Limine excluding from

3   evidence the discussion of any other "court" proceedings in which Contreras was involved.

4   During the examination of Victoria Gutierrez, Plaintiffs argue that she referenced the criminal

5   proceedings against McCabe in violation of the Motion in Limine.  Plaintiffs argue that the

6   introduction of this evidence was prejudicial to Plaintiffs because it gave the jury an alternate

7   reason, aside from the facts in dispute, to decide the case in Defendant's favor, i.e. that there had

8   been another court proceeding that the defendant had already been subjected to.  Plaintiffs

9   conclude that, "The defense called Victoria Gutierrez, yet not only did not tell her about the

10  motion in limine precluding discussion of other court proceedings."  Plaintiffs' Motion for New

11  Trial at 27:15-25.

12       *Discussion*

13       Plaintiffs cite only to pages 48 and 49 of the trial testimony of Victoria Gutierrez to

14  support the assertion that Gutierrez "made reference to the criminal proceedings against

15  McCabe."  Plaintiffs' Motion for New Trial at 27:16-19.  These two pages read:

16  **Q:    Haven't you testified or given a statement that the officer said, "Stop or I'll shoot you"?  Didn't you say that to one of the investigators?**

17  A:    Did I testify that in court or did I say that to one of the investigators?

18  **Q:    Either one.**

19  A:    I believe I told [Investigator] Ponting that.

20  **Q:    Yeah.  Now, you did, and we used the term "other proceedings" in this trial.**

21  A:    Um-hmn.

22  **Q:    And you've been told that, haven't you?**

23  A:    I've been told what?

24  **Q:    If you testified, just say it was another proceeding.  Time, place and were are not relevant to this trial.  And Mr. Ferguson told you those are the rules, didn't he?**

26

27  A:    I don't understand.

28

**Q:** All right.  If you testified somewhere else, under the rules, we can't talk about where, just that you testified.  We call it "other proceedings."  That's the rules.

A:   Okay.

**Q:** Did Mr. Ferguson explain the rules before calling you as a witness.

A:   I don't think so.

**Q:** Okay.  Well, I have now.  Will you accept that?

A:   Yes.

**Q:** Thank you.
Now, you took the oath, the same oath you got here to promise to tell the truth.

A:   Yes.

**Q:** Were you asked, "Did you see whether or not the vehicle backed up past the officer?"

A:   I don't believe so.  At least not in those words.

November 12, 2004, Testimony of Victoria Gutierrez at 48:15-49:24.

Plaintiffs' argument is patently frivolous.  Although Gutierrez was a defense witness, the questioning is by Co-Plaintiffs' counsel, Robert Seeman, and there are no objections.  Moreover, as the excerpt shows, Gutierrez never mentioned a "criminal proceeding" or "other proceeding" and she most certainly did not say "the criminal proceedings against McCabe."  The only citation of Gutierrez's testimony to which Plaintiffs cite shows that Co-Plaintiffs' counsel was the only one talking about "other proceedings."  This evidence fails to show any violation of motions in limine, fails to show attorney misconduct by Defense Counsel, and completely fails to show that Gutierrez even "made reference to the criminal proceedings against McCabe."  This ground is not a valid basis for a new trial.

### 5.     *Violation of Motion in Limine for Introducing Evidence of Alleged Drug Use*

Plaintiffs argue that Defense Counsel improperly introduced evidence from Officer McCabe regarding alleged drug use by Contreras.  Specifically, Plaintiffs argue that Attorney Ferguson elicited testimony from McCabe that, "Due to the fact that I know this individual was

under the influence of a controlled substance." See November 5, 2004 testimony of Jeffrey

McCabe at 137:18-19.  Plaintiffs argue that the statement was pre-planned and violated this

Court's ruling in limine that Contreras' drug use was not relevant.  Plaintiffs argue that the

introduction of the evidence of drug use by Contreras was prejudicial because it describes

Contreras as a drug user.

*Discussion*

The relevant portion of McCabe's testimony in regards to this ground of error reads:

**Q:      Were there any other people around?**

A:      I knew they were.  I didn't know where they were.

**Q:      Did that cause you any concern?**

A:      Yes, sir.

**Q:      Why is that?**

A:      Due to the fact that I know this individual [Contreras] was under the influence of
        a controlled substance - -

Mr. McMillan:        Objection, Your Honor.  Lack of foundation.  Violation motion in
                     limine.

The Court:           Sustained as to the - - the answer itself.  It does go beyond the
                     scope of this person's actual knowledge.

Mr. McMillan:        Move to strike.

The Court:           Disregard the last answer.

November 5, 2005, Testimony of Jeffrey McCabe at 137:11-23.

Here, Plaintiffs objected to the testimony of McCabe and the objection was sustained.

Moreover, the Court instructed the jury to disregard the last answer as requested by Plaintiffs.

The Court granted the relief requested by Plaintiffs at the time of the answer.  Juries are

presumed to follow instructions given to them by the Court.  See Doe, 232 F.3d at 1270-71.  The

comment was not so prejudicial that its prejudicial effect could not be cured by an instruction to

disregard or that its effect permeated the entire proceedings.  There is nothing in the record that

indicates that the statement was planned, and McCabe testified shortly thereafter, without

objection, that he personally believed that Contreras was under the influence of a controlled

substance.  See November 5, 2004, Testimony of Jeffrey McCabe at 137:24-138:4 & 156:17-23.

McCabe had also earlier testified that Contreras was exhibiting behavior that indicated that

Contreras was under the influence of a controlled substance.  See id. at 90:1-21.  Any error was

adequately addressed by the Court instructing the jury to disregard McCabe's answer.  See Doe,

232 F.3d at 1270-71.  The Court cannot say that this isolated, partial answer permeated the

proceeding or inflamed and unfairly prejudiced the jury in a manner sufficient to warrant a new

trial.  This ground is not a valid basis for a new trial.


### 4.  **JURY MISCONDUCT THROUGH EXTRANEOUS INFORMATION**

Plaintiffs argue that the Court should investigate the extent that extrinsic information

influenced the jury, which may lead to a finding of prejudice and thus, require a new trial.

Plaintiffs have offered only the affidavit of Scott McMillan, the Plaintiffs' counsel, in support of

their claim of juror misconduct.  The declaration, in its entirety, reads:

> I, Scott A. McMillan, declare:
>
> 1.      I am the attorney of record for Plaintiffs Yvette Contreras, and infants Raylene R. Contreras, Aileen A. Contreras, Joleen S. Contreras, and Abbie Y. Contreras.  If called before this Court, I could and would testify competently to the following facts based on my personal knowledge.
>
> 2.      Immediately following the Jury's delivery of its verdict, I spoke with the two male jurors Brian Kitson and Leonard Mattos.  Present with me were Plaintiff's attorney Bob Seeman, and Milton G. Evangelou.
>
> 3.      During the course of our conversation, Mr. Kitson specifically referred to Defendant Jeffrey McCabe's criminal prosecution.  The statement was noteworthy because none of us had discussed the criminal prosecution with Mr. Kitson or Mr. Mattos.  Mr. Kitson's reference to "the criminal case" was explicit. That reference indicated a familiarity with facts not introduced in the case.  The comment passed without any of us three attorneys remarking about it.
>
> 4.      Our conversation with those two jurors took place immediately following their exit from the elevator in the lobby of the courthouse lounge.
>
> I declare under the penalty of perjury of the laws of the United States that the foregoing is true and correct and that this declaration was signed on December 13, 2004, at San Diego County, California.

40

December 13, 2004, Declaration of Scott A. McMillan.

Plaintiff argues that this declaration shows that the extraneous influence is the reference and extent to which "the jury relied on the criminal proceedings mentioned during trial." See Plaintiffs' Motion for New Trial at 29:6-7. Accordingly, Plaintiffs argue that the Court should conduct an investigation into jury misconduct to the extent the jury took into account extraneous influences.

Defendants object that Attorney McMillan's affidavit is hearsay, conclusory and ambiguous and should be disregarded. Defendant argues that the declaration is incomplete regarding the exact nature and details of what was conveyed by Mr. Kitson. There is no indication of a causal connection between a reference to a criminal proceeding and its effect on the verdict, and this mere reference does not support a finding of substantial prejudice. Furthermore, the reference does not itself establish misconduct. Throughout the trial there were references to "other proceedings" and the jury could have concluded that they were "criminal proceedings." Finally, the overwhelming weight of the evidence is consistent with the verdict; thus, any alleged prejudice is overcome by the weight of the evidence. Defendants argue that Plaintiffs have simply failed to meet their burden.

*Legal Standard*

A new trial may be granted on the basis of juror misconduct. See Hard v. Burlington Northern R.R. Co., 812 F.2d 482, 486 (9th Cir. 1987) (hereinafter "*Hard I*"). "Where a losing party in a civil case seeks to impeach a jury verdict, it must be shown by a preponderance of the evidence that the outcome would have been different." Hard v. Burlington Northern R.R. Co., 870 F.2d 1454, 1461 (9th Cir. 1989) (hereinafter "*Hard II*"); TIG Ins. Co. v. Liberty Mutual Ins. Co., 250 F.Supp.2d 1197, 1199 (D. Ariz. 2003). However, where "affidavits or juror testimony or other evidence of juror statements are offered to impeach a verdict, the district court must examine this material to decide whether it falls within the categories of admissible juror testimony permitted by Rule [of Evidence] 606(b)." Hard II, 870 F.2d at 1461. Rule of Evidence 606(b) prohibits juror testimony about the subjective effects of extrinsic information on jurors

and about the jury's deliberative process, but does allow juror testimony on whether extraneous, prejudicial information was improperly brought to the jury's attention.  See Fed. R. Evid. 606(b); Hard II, 870 F.2d at 1461; Hard I, 812 F.2d at 485-86; TIG Ins., 250 F.Supp.2d at 1199.  Rule 606(b)'s prohibition extends not only to statements made by juror's themselves, but also to evidence of "any sort as to a statement by a juror" so long as the juror himself would be barred from making the statement before the court in the form of testimony.  See Hard II, 870 F.2d at 1461.

In reviewing the moving party's evidence, the trial court may be required to hold a form of evidentiary hearing in order to determine whether a new trial is warranted because of jury misconduct.  See Hard II, 870 F.2d at 1461-62.  In some circumstances, however, the trial court may decide the issue on the basis of the evidence presented and without holding an evidentiary hearing.  See Morgan v. Woessner, 997 F.2d 1244, 1261 (9th Cir. 1993).  In making its determination as to the necessity of further investigatory procedures, the trial court should be guided by "the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source."  Hard I, 812 F.2d at 485.  Nevertheless, if the moving party's evidence fails to show on its face that the outcome of the trial would have been different, no evidentiary hearing is necessary.  See Morgan, 997 F.2d at 1261; Hard II, 870 F.2d at 1461; TIG, Ins., 250 F.Supp.2d at 1199.  As explained in Hard II:

> Looking only at affidavits and testimony admissible under Rule 606(b), the court must decide whether an evidentiary hearing is required to determine whether a new trial is necessary.  *An evidentiary hearing is justified only when these materials are sufficient on their face to require setting aside the verdict.*  Where a losing party in a civil case seeks to impeach a jury verdict, it must be shown by a preponderance of the evidence that the outcome would have been different.  *Unless the affidavits on their face support this conclusion, no evidentiary hearing is required.*

Hard II, 870 F.2d at 1461 (emphasis added).

*Discussion*

As an initial matter, the declaration of Attorney McMillan deals with the existence of external information and does not deal with jury deliberations or the subjective effects of

1    extraneous information on the jury; the declaration is therefore not barred under Rule 606(b).

2    See Fed. R. Evid. 606(b); Hard II, 870 F.2d at 1461.  Also, "affidavits or juror testimony or other

3    evidence of juror statements" may be offered to impeach a verdict.  See Hard II, 870 F.2d at

4    1461.   The declaration of Attorney McMillan would appear to be "other evidence of juror

5    statements."  Since the declaration does not run afoul of Rule 606(b), it is admissible

6    notwithstanding Defendant's hearsay objection.  See Hard II, 870 F.2d at 1461 (noting that where

7    "other evidence of juror statements" are offered to impeach a verdict, the court must determine

8    whether the evidence is permitted under Rule 606(b)).

9          Nevertheless, Plaintiffs have not met their burden because the declaration presents only a

10   vague and ambiguous statement.  In Hard, the plaintiff "presented the affidavits of three jurors

11   stating that during the deliberations, [juror] Fraser made statements regarding Burlington

12   Northern's settlement practices."  See Hard I, 812 F.2d at 483.  Specifically, the plaintiff

13   submitted "affidavits from three jurors which purport[ed] to establish that one of their members

14   had been an employee of the defendant and disclosed to the jury his knowledge of the manner in

15   which defendant handles employees' accident claims."  Hard v. Burlington Northern R.R. Co.,

16   618 F.Supp. 1463, 1465-66 (D. Mont. 1985).  The district court ruled against Hard on the jury

17   misconduct issue, but the Court of Appeals reversed and remanded for an evidentiary hearing.

18   See Hard I, 812 F.2d at 486.  The Court of Appeals held that, if a juror's past experience was

19   directly related to the litigation, as the three filed affidavits claimed, then the discussion of those

20   experiences would constitute extraneous information that could be used to impeach the verdict.

21   See Hard II, 870 F.2d at 1462 (explaining Hard I, 812 F.2d at 486) (emphasis added).

22         Here, in contrast, Plaintiffs have only presented evidence that Mr. Kitson mentioned

23   either the "criminal case" or the "criminal prosecution."  See Declaration of Scott McMillan at ¶

24   3.  There is no detail given about what precisely was said (although based on the quotation marks

in the declaration, it appears that Mr. Kitson said "the criminal case"),[18] in what context it was said, or how often Mr. Kitson mentioned it.  There is nothing in the declaration that indicates that Plaintiffs's attorneys asked Mr. Kitson to elaborate on what he meant by "criminal case" or how or when he knew that there had been a criminal case or whether the jury was aware of the criminal case and, if so, how and when the jury became aware.  There is also no indication of Mr. Mattos mentioning the "criminal case."  Furthermore, unlike the declarations in *Hard*, there is no indication that the jury was improperly given the information by a fellow juror, or, for that matter, even obtained the information from an outside source such as from another person or a document not in evidence.[19]  Furthermore, without additional detail or context, Kitson may have assumed that the "other proceeding" that was referenced throughout trial by both sides was a criminal proceeding.

In order for a trial court to be justified in ordering an evidentiary hearing to determine jury misconduct in a civil case, the moving party must present materials of jury misconduct that are sufficient on their face to require setting aside the verdict.  See Morgan, 997 F.3d at 1261; Hard II, 870 F.2d at 1461.  Without this showing, no evidentiary hearing is required.  See Hard II, 870 F.2d at 1461.  Plaintiffs' evidence of jury misconduct is a vague statement, with very little context, made by one juror, and that fails to indicate knowledge by the jury or how or when such knowledge may or may not have been obtained.  Although evidence may not necessarily need to be as direct as in *Hard* in order to justify some form of evidentiary hearing, more is required than the evidence presented by Plaintiffs.  Plaintiffs have failed to present evidence that is sufficient on its face to justify setting aside the verdict, that is, the evidence presented does not indicate on its face that the outcome would have been different.  See Hard II, 870 F.2d at 1461.  Accordingly,

---

[18]This is a particular concern in light of the argument in this motion by Plaintiffs' Counsel concerning the testimony of Victoria Gutierrez.  Despite Plaintiffs' Counsel's representations concerning Gutierrez's testimony, the cited deposition testimony showed that Gutierrez made no references to a "criminal proceeding."

[19]On the second day of trial, Defense counsel brought to the attention of the Court that an article in the local newspaper ran a story on the case at bar.  See Partial Transcript of Trial on November 4, 2004 at pp. 4-5.  The Court specifically asked if anyone had read the article, received no affirmative indications, and admonished the jury not to read articles or news accounts relating to this case.  See id. at pp. 40-41.

there is insufficient evidence to support a finding of jury misconduct or warrant further

investigation/an evidentiary hearing; Plaintiffs have failed to meet their burden.  See Morgan,

997 F.2d at 1261; Hard II, 870 F.2d at 1461.


**5.**     **EXCESSIVE FORCE AS A MATTER OF LAW**

Plaintiffs' argue that Contreras was subject to excessive force as a matter of law.

Plaintiffs rely primarily on the testimony of Jose Lepe to argue that the use of force was

excessive because McCabe was in no danger of serious bodily injury or death.

*Standard*

"A district court may set aside a jury verdict and grant judgment as a matter of law 'only

if, under the governing law, there can be but one reasonable conclusion as to the verdict.'"

Settlegoode v. Portland Pub. Schs, 371 F.3d 503, 510 (9th Cir. 2004); Winarto v. Toshiba Am.

Elecs. Components, Inc., 274 F.3d 1276, 1283 (9th Cir. 2001); Fed. R. Civ. P. 50.  When

considering a motion to set aside a jury verdict, the court "should review all of the evidence in

the record" in the light most favorable to the non-moving party and must draw all reasonable

inferences in favor of the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 150-51 (2000) (citations omitted); see also Settlegoode, 371 F.3d at 510; City

Solutions v. Clear Channel Communs., Inc., 365 F.3d 835, 839 (9th Cir. 2004); Horphag

Research, Ltd, v. Pellegrini, 337 F.3d 1036, 1040 (9th Cir. 2003).  The court "may not make

credibility determinations or weigh the evidence" and "must disregard all evidence favorable to

the moving party that the jury is not required to believe."  Reeves, 530 U.S. at 150-51;

Settlegoode, 371 F.3d at 510.  "The court must accept the jury's credibility findings consistent

with the verdict . . . [and] may not substitute its view of the evidence for that of the jury."

Winarto, 274 F.3d at 1283.

*Discussion*

The standard for judgment as a matter of law is very stringent, and Plaintiffs have not met

it.  The jury is instructed that it may believe all, part, or none of any witnesses testimony, and the

1   fact of inconsistencies is to be weighed by the jury as they see fit.  See Court Docket No. 169,

2   Instruction No. 10; see also Ninth Circuit Model Instruction 3.6.  Plaintiffs's claim rests on

3   alleged inconsistencies by McCabe in his current and prior testimony and on the testimony,

4   primarily, of Jose Lepe.

5          However, as explained above, Dobbins, McCabe, and Gutierrez all testified that McCabe

6   was behind the car as it was backing up, that the car was moving very fast, and if McCabe had

7   not moved, he would have been struck by the car.  The only evidence that supports Lepe's

8   version of events is Lepe himself.  No other eye witness testified that McCabe walked beside

9   Contreras's car and shot while he (McCabe) was in the blue, diagonal lines of the handicapped

10  parking stall.  The jury could very well have disregard the entirety of Lepe's testimony and were

11  not required to believe any of Plaintiffs's witnesses.  The testimony of Dobbins, Gutierrez, and

12  McCabe, taken together, clearly show that the car was backing up towards McCabe very fast and

13  support the conclusion that deadly force was reasonably used.  Furthermore, Plaintiffs's

14  argument is essentially that all defense witnesses's testimony should be disregarded.  This is

15  contrary to the standards for judgment as a matter of law.  There is testimony and evidence that

16  supports a finding that McCabe was in immediate danger of serious bodily injury or death and

17  that the use of force was reasonable.  Viewed in the light most favorable to the verdict, there is

18  more than enough evidence to support the jury's verdict.  Plaintiffs's have failed to show that

19  there can be but one conclusion and that the jury's conclusion was not it.  See Settlegoode, 371

20  F.3d at 510; Winarto, 274 F.3d at 1283.

21

22                                    **CONCLUSION**

23         Plaintiffs have moved for a new trial on the bases that the verdict is against the clear

24  weight of the evidence, the Court erred by refusing to give requested jury instructions, Defense

25  Counsel engaged in misconduct, and juror misconduct.  Plaintiffs also move for judgment as a

26  matter of law that Contreras was subject to excessive force.

27         With respect to the sufficiency of the evidence, Plaintiffs rely on the testimony of Jose

28                                          46

Lepe and alleged inconsistencies in the testimony of McCabe to show that Contreras posed no threat to McCabe that would justify the use of excessive force.  However, the testimony of McCabe, Gutierrez, Dobbins, and Callanan all support the verdict that Contreras was backing up his car towards McCabe at a high rate of speed and that McCabe had to move out of the way to avoid being struck by the car.  Although Plaintiffs argue that the testimony of these four witness is unworthy of belief, the Court cannot agree.  There may be some inconsistencies, but the inconsistencies are not so severe that the witnesses' testimony is entitled to no weight.  Furthermore, Lepe is the only witness who testified that McCabe walked along the side of Contreras's car, shot Contreras as Contreras was moving forward and while McCabe was in the blue, diagonalled portion of the handicapped parking stall.  Having given full respect to the jury's findings, and having reviewed the evidence and arguments of the parties, and having observed the witnesses during trial, the Court cannot say that it is "left with the definite and firm conviction that a mistake has been committed." Landes Const., 833 F.2d at 1372.

With respect to the refusal to give requested instructions, the instructions requested by Plaintiffs were either adequately covered by other given instructions, misleading, argumentative, or lacking in foundation.  There was no error in refusing to give the requested instructions.

With respect to the alleged misconduct of Defense Counsel, the conduct complained of is not as severe and prejudicial as Plaintiffs argue or is simply not misconduct.  Moreover, to the extent there was misconduct, the instructions of the Court adequately addressed the issue.  Even assuming misconduct, the Court cannot say that it so permeated the proceeding that the jury was improperly influenced by passion and prejudice, nor can the Court say that the arguments caused the integrity or fundamental fairness of the proceedings to be called into question.  See Bird, 255 F.3d at 1148; Doe ex. rel. Rudy-Glanzer, 232 F.3d at 1270-1271; Anheuser-Busch,  69 F.3d at 346.

With respect to juror misconduct, Plaintiffs' burden is to present evidence that is sufficient to show on its face that, in the absence of extraneous information, the verdict would have been different.  See Hard II, 870 F.2d at 1461.  Absent such a showing, no further

evidentiary hearings are necessary.  Here, Plaintiffs have not met their burden.  The only evidence is the affidavit of Plaintiffs' counsel.  The affidavit, however, is too vague and lacks in details.  It simply does not show on its face that, absent extraneous information, the verdict would have been different.  Plaintiffs have failed to meet their burden.  See Morgan, 997 F.2d at 1261; Hard II, 870 F.2d at 1461.

Finally, Plaintiffs move for judgment as a matter of law that Contreras was subjected to excessive force.  Judgment as a matter of law has a stringent standard that is similar to summary judgment.  Here, the testimony of McCabe, Gutierrez, Dobbins, and Callanan all support the jury's verdict and show that Contreras was not subject to excessive force.  Plaintiffs wish to disregard this in favor of the testimony of Jose Lepe.  However, that is contrary to the standards for judgment as a matter of law.  There is more than sufficient contrary evidence to Plaintiffs' position.  It is inappropriate to grant Plaintiffs judgment as a matter of law that Contreras was subjected to excessive force.


Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for New Trial is DENIED in its entirety.

IT IS SO ORDERED.

**Dated:    April 29, 2005**               **/s/ Anthony W. Ishii**
0m8i78                          UNITED STATES DISTRICT JUDGE